# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Stacey S.,

Case No. 18-cv-3358 (ADM/TNL)

       Plaintiff,

v.

**REPORT & RECOMMENDATION**

Andrew Saul,
Commissioner of Social Security,[1]

       Defendant.

Ana Catalina Pottratz Acosta, Mitchell Hamline School of Law, 875 Summit Avenue, St. Paul, MN 55105 (for Plaintiff); and

Tracey Wirmani, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 340, Mailroom 104, Dallas, TX 75202 (for Defendant).

# I. INTRODUCTION

Plaintiff Stacey S. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 14) and the Commissioner's Motion

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Jan. 23, 2020). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

for Summary Judgment (ECF No. 16).  These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Ann D. Montgomery, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **DENIED**; and this matter be remanded to the Social Security Administration for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that she has been disabled since July 2015 due to cerebral atrophy, dizziness, and confusion.  (Tr. 19, 76, 85.)  Plaintiff's applications were denied initially and again upon reconsideration.  (Tr. 19, 83, 92, 94-95, 112, 130, 133-34.)

Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 19, 144.)  The ALJ held a hearing in January 2018, and issued an unfavorable decision.  (Tr. 19, 33, 35, 19-27.)

After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council.  (Tr. 194-95; *see* Tr. 331-47.)  As part of her request for review, Plaintiff submitted new evidence that was not available at the time of the hearing,  namely, a neurological evaluation.  (Tr. 331, 12-15.)  The Appeals Council denied Plaintiff's request for review.  (Tr. 1-5.)

Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 14, 16.) This matter is now fully briefed and ready for a determination on the papers.

## III. MEDICAL RECORDS

From October 2003 until her alleged onset in July 2015, Plaintiff worked part-time as an office cleaner. (Tr. 254-255; *see, e.g.*, Tr. 351, 402, 404.) In March 2013, Plaintiff was diagnosed with mild to moderate cerebellar atrophy and minimal cerebral atrophy following a brain MRI. (Tr. 403, 407, 415, 356.) Plaintiff also has a history of special-education services. (*See, e.g.*, Tr. 12-13, 576, 592, 650.)

### A. Pre-2015

In November 2014, Plaintiff was admitted to the hospital following complaints of worsening nausea, vomiting, and diarrhea for the past two weeks. (Tr. 386, 395, 400, 402, 415.) Plaintiff also reported feeling "very lightheaded" and like "she was spinning." (Tr. 387; *accord* Tr. 402, 415.) It was noted that Plaintiff had presented similarly "in March 2013." (Tr. 387; *accord* Tr. 403, 415.) A CT scan of her brain showed "[m]ild generalized cerebral and cerebellar atrophy . . . unchanged from" 2013. (Tr. 407; *see* Tr. 387.)

### B. 2015

On July 23, 2015, Plaintiff presented to the emergency room with complaints of nausea, vomiting, and diarrhea. (Tr. 424, 431.) Plaintiff reported having these symptoms for a couple of weeks. (Tr. 424, 429; *see* Tr. 356.) Plaintiff also felt dizzy. (Tr. 424; *see* Tr. 356.) Two days later, on July 25, Plaintiff returned to the emergency room with continued complaints of dizziness and nausea. (Tr. 436, 440-441.)

3

On July 31, Plaintiff went to work. (Tr. 463, 444.) Plaintiff's mother spoke with her around 11:00 a.m. (Tr. 463, 444.) Plaintiff "was comprehensible," but her speech was "slurred" and she "sa[id] things that did not make sense." (Tr. 463; *accord* Tr. 444.) When Plaintiff did not show up for her ride later, a "security guard found her 'sitting down and talking about [C]inco de [M]ayo.'" (Tr. 463; *accord* Tr. 444; *see* Tr. 459.)

Plaintiff returned to the emergency room on August 1 with complaints of "nausea, vomiting, dizziness, and confusion." (Tr. 463; *accord* Tr. 444, 475; *see* Tr. 450.) While Plaintiff correctly identified the date and hospital, she incorrectly identified former President Bill Clinton as the president rather than then-current President Barack Obama.[2] (Tr. 453.) Plaintiff "[a]lso spoke gibberish about what she was doing at work for the last 24 hours." (Tr. 453.) Approximately 40 minutes later, testing showed that Plaintiff had *no* alcohol in her system. (Tr. 453, 467; *see* Tr. 603.) An "MRI was unremarkable other than [the] previously noted cerebellar atrophy." (Tr. 463; *accord* Tr. 445, 476.)

Treatment notes from this encounter contain conflicting information regarding Plaintiff's alcohol use. Plaintiff reported using "alcohol 'once in a[]while' (shot of brandy or margarita every weekend." (Tr. 466.) Treatment notes state that Plaintiff had a "[p]ositive history of alcohol use, including beer, wine and margaritas." (Tr. 470.) Plaintiff could not recall "when her last drink was." (Tr. 470.) It was thought that Plaintiff's confusion was "most likely blackout due to alcohol." (Tr. 470; *see* Tr. 445, 476.) The

---

[2] *See, e.g.*, *Chronological List of Presidents, First Ladies, and Vice Presidents of the United States*, The Library of Congress, https://www.loc.gov/rr/print/list/057_chron.html (last visited Jan. 23, 2020).

treatment provider noted seeing Plaintiff before; "alcohol use was a concern"; and Plaintiff "minimize[d] her alcohol use." (Tr. 470; *see* Tr. 445, 476.)

During a follow-up appointment a couple of days later, Plaintiff reported ongoing nausea and dizziness. (Tr. 361.) Plaintiff's mother felt like Plaintiff was "still more confused than normal." (Tr. 361.) Plaintiff also stated that "her job is getting the best of her," and "[h]er alcohol intake depend[ed] on what kind of day she . . . had.'" (Tr. 361.) Plaintiff reported "drink[ing] a beer to help her pass gas"; "ha[ving] a margarita here and there"; and "often ha[ving] a shot of brandy after a long day at work." (Tr. 361.) Plaintiff's mother reported that Plaintiff "drinks quite a bit." (Tr. 361.) Among other things, it was recommended that Plaintiff refrain from "ongoing alcohol use." (Tr. 363.)

The next day, Plaintiff met with Cara Elizabeth Simone, PA-C, her primary care provider. (Tr. 364; *see, e.g.*, Tr. 362, 612.) Plaintiff reported "feeling better but not '100%,'" and still had dizziness when she sat or stood up. (Tr. 364.) Plaintiff reported drinking "occasionally," stating that "[s]he usually has [a] total of 1 pint [of] vodka during the weekend and maybe 1-3 bottles of beer." (Tr. 364.) Plaintiff also might have a margarita when she goes out with friends. (Tr. 364.) Plaintiff was encouraged to follow up with physical therapy "for further evaluation of dizziness and balance problems" and referred to neurology. (Tr. 367.) When Plaintiff returned for a follow-up appointment towards the end of August, Plaintiff reported that her balance was "improving," and she was "able to walk short length without the walker." (Tr. 369.) Plaintiff also "wonder[ed] when she c[ould] go back to work." (Tr. 369.)

At the end of August, Plaintiff met with John Warren Floberg, M.D., for a neurologic consultation. (Tr. 603.) Dr. Floberg noted that Plaintiff's "memory [wa]s back to normal." (Tr. 603.) Plaintiff was using a walker, and her mother reported that Plaintiff was "continuing to have some issues, especially with her ability to get around." (Tr. 603.) Plaintiff reported that "she had an occasional alcoholic beverage but she does not go along with having problems with alcohol as indicated by the notes." (Tr. 604.)

With respect to his neurologic exam, Dr. Floberg noted: "Mental status shows the patient to score 28/30. Reproduction of a complex geometric figure was unsatisfactory. Initially she could recall 2 of 3 words at 3 minutes with 2 clues. Later on she could recall only 1 of 3 words with 2 clues." (Tr. 604.) Dr. Floberg noted that while the assessment during Plaintiff's hospitalization was "possible alcohol use alone with nutritional deficiencies," Plaintiff's "alcohol level was 0," which "ma[de] it a little difficult to say it was all due to alcohol." (Tr. 604.) Dr. Floberg recommended that Plaintiff continue with physical therapy and appear for reexamination in one month. (Tr. 604.)

Plaintiff participated in physical and occupational therapy between approximately mid-August through mid-September. (*See* Tr. 482-530, 539-551.) In the beginning, Plaintiff reported "intermittent dizziness" and was using a walker "due to feeling off balance." (Tr. 482.) Plaintiff reported "struggling with taking showers (currently sponge bathing), getting meals, and doing her laundry." (Tr. 482.) Plaintiff also reported "difficulties with memory." (Tr. 482.) At the time, Plaintiff was living alone in a studio apartment and her mother or sister assisted with her laundry. (Tr. 403, 484, 506, 603.)

6

Approximately two weeks later, Plaintiff was walking around her apartment without the walker. (Tr. 500.) Plaintiff was also able to complete "basic [activities of daily living]," but at a "much slower" pace. (Tr. 504.) Plaintiff had "occasional" dizziness, but it did "not . . . affect[] her mobility significantly." (Tr. 508.)

Around the beginning of September, Plaintiff's therapists recommended that she return to work at four hours per day. (Tr. 516, 521, 525, 528.) Plaintiff's occupational therapist noted that Plaintiff was "difficult to treat[] as she tend[ed] to provide conflicting information and several excuses." (Tr. 519; *accord* Tr. 522, 529.) Plaintiff also did "not seem very interested in treatment options, nor ha[d] she followed-through with any suggestions." (Tr. 522; *accord* Tr. 529; *see* Tr. 521.) Plaintiff's occupational therapist also noted that Plaintiff "doesn't want to return to work." (Tr. 522; *accord* Tr. 529.) About the same time, Plaintiff's physical therapist observed "self-limiting behaviors and questionable reporting of response to treatment." (Tr. 524.) Plaintiff "[r]efused to advance exercises and w[ould] only participate at her self-selected pace." (Tr. 524.)

Around the middle of September, Plaintiff was discharged from physical therapy. (Tr. 545.) Plaintiff was described as "non-compliant with all recommendations including home exercise program to address strength, activity tolerance, and dizziness." (Tr. 545; *accord* Tr. 550; *see* Tr. 541.) Plaintiff "lack[ed] carry over between sessions, often presenting with excuses and conflicting information related to activities performed at home to progress overall mobility." (Tr. 544; *accord* Tr. 550.) At the last session, Plaintiff appeared with a "bent and broken walker." (Tr. 544; *accord* Tr. 549.) Plaintiff's physical

therapist instructed her to "get rid of [it] as it is a safety hazard and she d[id] not need to be using it anyway." (Tr. 544-45; *accord* Tr. 549.)

The next day, Plaintiff had an appointment with Simone. (Tr. 372.) Plaintiff felt that she was improving and was "able to walk on her own with good balance again." (Tr. 372.) Simone noted that Plaintiff was using the broken walker that her physical therapist had instructed her not to use. (Tr. 372.) Simone stated that Plaintiff was "able to return to work for short periods of time starting [October 1]." (Tr. 374; *see* Tr. 379.)

Plaintiff presented to the emergency room again towards the end of October with complaints of dizziness and nausea. (Tr. 552, 558.) Plaintiff reported feeling "like she 'was in lala land.'" (Tr. 558.) Notes from this visit regarding Plaintiff's alcohol use state: "1 pint of whiskey for the weekends and couple bottles of beer." (Tr. 554.)

Around the beginning of November, Plaintiff met with Simone to have a form completed. (Tr. 375.) Plaintiff noted that she had lost her job "because her paperwork was not returned in the amount of time required." (Tr. 375.) Plaintiff's walking had improved, but she still complained of "dizzy spells every 2 hours or so." (Tr. 375.) Simone noted that Plaintiff "is very forgetful and mom reports she will call her multiple times in the same day and ask the same questions." (Tr. 375.)

Approximately one week later, Plaintiff went to the emergency room again with continued complaints of dizziness and nausea. (Tr. 562, 571.) Plaintiff "fe[lt] as though her head '[wa]s somewhere else,'" and her dizziness was exacerbated when she sat or stood up. (Tr. 562.) Plaintiff "report[ed] not drinking any alcohol in months although state[d] that she has the sensation of currently being drunk." (Tr. 563; *see* Tr. 572.) Plaintiff's

treatment provider was "[s]urpris[ed]" when Plaintiff's blood alcohol level was .289 as she appeared "clinically sober on exam and walk[ed] without difficulty." (Tr. 567; *see* Tr. 566, 605.) Plaintiff's dizziness was attributed to alcohol use. (Tr. 567.)

Plaintiff followed up with Dr. Floberg in mid-November. (Tr. 605.) Plaintiff reported that "[t]hings [we]re not going well," and she continued to struggle with balance, clumsiness, and dizziness. (Tr. 605.) Plaintiff "insist[ed] that she is not drinking." (Tr. 605.) Dr. Floberg noted that Plaintiff was no longer using a walker, which "[wa]s an improvement." (Tr. 606.) Dr. Floberg thought "[a]lcohol could be playing a role," but ordered a brain MRI "to make sure there is no new lesion to explain." (Tr. 606.) Dr. Floberg discussed with Plaintiff "the importance of not drinking." (Tr. 606.) The brain MRI "show[ed] atrophy [that was] excessive for [Plaintiff's] age," which Dr. Floberg opined was likely due to alcohol. (Tr. 606; *see* Tr. 607, 610.)

Plaintiff next saw Dr. Floberg in mid-December. Upon examination, Plaintiff "scored 30/30 on a Mini-Mental Status. She did require 2 clues to remember 3 words at 3 minutes." (Tr. 607.) Dr. Floberg noted that "[t]his [wa]s an improvement compared to how she did in August." (Tr. 607.) Plaintiff expressed concerns about her memory and Dr. Floberg ordered "neuropsychometric testing to get an assessment of her cognitive situation." (Tr. 607.) Overall, Dr. Floberg noted that Plaintiff "ha[d] shown steady improvement since [he] initially saw her in August." (Tr. 607.)

## C. 2016

In early January 2016, Plaintiff met with Gail L. Risse, Ph.D., for a neuropsychological evaluation. *See infra* Section IV.A. Plaintiff reported some continuing

dizziness and "that her memory has definitely gotten worse over time." (Tr. 576; *accord* Tr. 586.) At the time, Plaintiff "live[d] alone in her own apartment but [wa]s only a few minutes from her mother's home by bus." (Tr. 576; *accord* Tr. 586.)

Plaintiff next met with Dr. Floberg in early February to discuss her "memory concerns." (Tr. 609.) Dr. Floberg that noted that Plaintiff had undergone neuropsychometric testing which showed that she "[wa]s performing in the borderline impaired range of overall intellectual ability," which "[wa]s consistent with her background and educational history," including "special education." (Tr. 609.) Dr. Floberg additionally noted that "[i]t [wa]s not clear if the current findings show evidence of cognitive decline or if they are stable." (Tr. 609.) Dr. Floberg further noted:

> The test results also show deficits in new learning and retention of information. This does not appear to be due to inattention. There was a concern on the test that the memory scores might reflect reduced effort and emotional factors which could be playing a role. She did say that she got bored with the test.

(Tr. 609.) Plaintiff also "continue[d] to drink occasionally." (Tr. 609.) Dr. Floberg "suspect[ed] that [Plaintiff] has always had a learning disability," but was not clear whether her condition had worsened since July 2015. (Tr. 609.) Dr. Floberg told Plaintiff "that she is not completely disabled from the workplace" and "could certainly carry out certain activities." (Tr. 609.) Dr. Floberg did not recommend any additional follow up. (Tr. 609.)

In November, Plaintiff was hospitalized overnight to treat dehydration after she presented to the emergency room with complaints of dizziness and nausea. (Tr. 635, 640.) Plaintiff was noted to be living alone at this time. (Tr. 635, 641.) Treatment notes state that Plaintiff "was inconsistent in her report of alcohol use, admitting that when she has [a]

low mood she 'sometimes will drink a beer or a margarita." (Tr. 635; *accord* Tr. 640.) Plaintiff's test results "raise[d] suspicion that she has been drinking more than she says, which would also fit with the clinical picture and the repeated negative workups during admissions for dehydration." (Tr. 635; *accord* Tr. 640; *see* Tr. 638, 643.)

Plaintiff was noted to "ha[ve] very concrete thought processes and [wa]s able to point to several inciting events for her worsening functionality since 2015," including the death of a sister and feeling mistreated at work. (Tr. 635; *accord* Tr. 640.) It was "suspect[ed]" that severe depression [wa]s playing a role in her current symptoms," which was "compounded by her borderline intellectual disability." (Tr. 635; *accord* Tr. 640; *see* Tr. 634.)

### D. 2017

In early February 2017, Plaintiff met with Paula Coyne, M.A., L.P., for an assessment. (Tr. 647.) Plaintiff's sister told Coyne Plaintiff checked out of work one evening but was found the next morning in the building, "passed out". (Tr. 647.) Plaintiff was living alone, but her parents wanted her to move in with them "so they can watch her more closely." (Tr. 649.) Plaintiff felt "anxious about paying all her bills." (Tr. 649.)

Coyne noted that Plaintiff was

> clean, casually dressed, neat. She made little eye contact, seemed a little teary at times, as she recounted feeling sick and overwhelmed. She is feeling less stressed now. She was not a clear historian at all, and she had poor word finding abilities probably related to her learning disabilities or lower functioning. She is anxious about money, about not working.

(Tr. 650.)  Plaintiff's PHQ-9 score was 8,[3] indicating mild depression and "somewhat difficult" functional impairment.  (Tr. 647.)  Coyne diagnosed Plaintiff with depression and encouraged her to work on stress-reduction strategies.  (Tr. 650.)

Plaintiff also met with Simone the same day she met with Coyne.  (Tr. 652.) Plaintiff's sister told Simone that Plaintiff "seems less confused than she had been previously."  (Tr. 652.)  Plaintiff was still experiencing "[d]izzy spells," but they were "less frequent than previously."  (Tr. 652.)

Plaintiff met with Coyne three times in March.  (Tr. 655-62.)  During the first visit, Plaintiff was "[d]istractible," and appeared "somewhat anxious and irritable."  (Tr. 655.) Plaintiff continued to report dizziness.  (Tr. 656.)  Plaintiff was having less anxiety since she was no longer working.  (Tr. 656.)  Plaintiff was not interested in trying medication. (Tr. 655.)  During the second visit, Plaintiff was "[o]riented and [d]istractible" with an "[a]ppropriate mood."  (Tr. 657.)  Plaintiff's PHQ-9 score was 4.  (Tr. 657.)  Plaintiff discussed moving due to an increase in rent.  (Tr. 658.)  The plan was for Plaintiff to pursue Adult Rehabilitative Mental Health Services ("ARMHS").[4]  (Tr. 658.)

The third appointment occurred following a mix-up regarding the ARMHS.  (Tr. 661.)  Plaintiff was again "[o]riented and [d]istractible," with an "appropriate mood."  (Tr. 660.)  Plaintiff's grooming was "poor."  (Tr. 661.)  This time, Plaintiff's PHQ-9 score was

---

[3] "The Patient Health Questionnaire, PHQ-9, is used to screen, diagnose, monitor, and measure the severity of depression."  *Ramo v. Colvin*, No. 13-cv-1233 (JRT/JJK), 2014 WL 896729, at *5 (D. Minn. Mar. 6, 2014).
[4] ARMHS "are mental health services that are rehabilitative and enable the member to develop and enhance psychiatric stability, social competencies, personal and emotional adjustment, and independent living and community skills when these abilities are impaired by the symptoms of mental illness."  *Adult Rehabilitative Mental Health Services (ARMHS)*, Minn. Dep't of Human Servs., https://www.dhs.state.mn.us/main/idcplg?IdcService= GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=ID_058153 (last accessed Jan. 23, 2020).

11, indicating moderate depression.  (Tr. 660.)  The anxiety screening also revealed mild anxiety.  (Tr. 661.)  Plaintiff continued to have complaints of dizziness and nausea.  (Tr. 661.)  Plaintiff "[r]ecalled knocking over the microwave trying to hold on to a wall."  (Tr. 661.)  Coyne noted that Plaintiff "walked with a cane today, like a much older person," and was "unable to grasp logistics in order to move her own process forward for housing and [d]isability."  (Tr. 661.)

Plaintiff met with Simone once in September and once in November.  (Tr. 663.)  Plaintiff continued to have complaints of dizziness.  (Tr. 663, 669.)  Plaintiff denied feeling depressed and was not interested in treatment.  (Tr. 663.)  In November, Simone noted that Plaintiff "[wa]s currently homeless and living either at her mom's or sister's."  (Tr. 669.)

Plaintiff saw neurologist Neil R. Dahlquist, M.D., in mid-November.  (Tr. 613.)  Plaintiff reported that her balance improved, but "never fully recovered."  (Tr. 613.)  Plaintiff had not had any falls, but held onto things when she got up and "lean[ed]" while standing and walking.  (Tr. 613.)  Plaintiff stated that "she would like to work, but she is between employment right now because she does not have a permanent residence," and reported "living between her sister's and mother's homes."  (Tr. 613.)

Upon examination, Dr. Dahlquist noted:

> Neurologic examination revealed a pleasant woman.  She was able to draw a clock correctly.  She said she could not recall 3/3 objects that she was able to register.  She could tell me 2 states that touch Minnesota but not North or South Dakota.  She knew Trump was the president and she knew he had recently been in Asia.  Otherwise, she walked quite well for me.  She was able to do tandem with concentration.

(Tr. 614.)

13

## IV. OPINION EVIDENCE

### A. Risse

During the neuropsychological evaluation, Risse noted that Plaintiff was "appropriately dressed and well groomed." (Tr. 576; *accord* Tr. 586.) "She displayed a full range of affect and a pleasant mood. [Her s]peech was fluent without word finding difficulty but thought content appeared somewhat tangential in casual conversation." (Tr. 576; *accord* Tr. 586.) Risse "noted that rapport was established easily and [Plaintiff] freely exchanged spontaneous conversation, maintaining appropriate eye contact." (Tr. 576; *accord* Tr. 586.)

Risse administered a number of tests to address areas such as intellectual abilities, attention and concentration, memory, and executive functioning. (*See* Tr. 577-79, 587-89.) Plaintiff "was compliant with testing but exhibited a somewhat tentative attitude about her responses, requiring frequent reassurance. [Plaintiff's i]nsight was appropriate and she was concerned about her performance." (Tr. 576; *accord* Tr. 586.) Risse noted that "it was sometimes difficult to determine if . . . [Plaintiff] understood test instructions appropriately. She did request frequent clarification and repetition. She maintained an adequate attention span most of the time and was usually able to stay on task with adequate and thoughtful execution of test procedures." (Tr. 576; *accord* Tr. 586.) Plaintiff "was alert at the outset of testing, but somewhat fatigued at the end," and "was given breaks as needed." (Tr. 576; *accord* Tr. 586.)

In most areas, Plaintiff scored in the low-average range or borderline to mildly impaired. (Tr. 577, 586.) With respect to memory testing, however, Plaintiff's scores

ranged from impaired to significantly impaired to severely impaired.  (Tr. 577, 587.)

Summarizing, Risse opined that Plaintiff "is performing in the borderline impaired range

of overall intellectual ability, and this is likely to be consistent with her background and

educational history.  It is unclear whether the current findings provide evidence of a

significant cognitive decline from a previous level of functioning."  (Tr. 577; *accord* Tr.

587.)

      Risse additionally opined:

> Within the context of low average to borderline abilities, this
> test profile is remarkable for significant deficits in new
> learning and retention of information in both the verbal and
> visual modalities.  This deficit cannot be attributed to
> inattention per se, although slowed processing speed may have
> affected her ability to perform on learning measures.  She also
> demonstrates impaired naming and verbal fluency which
> undoubtedly contributes to poor performance on measures of
> verbal recall.  Mild deficits of executive problem solving are
> also recorded.

(Tr. 577-78; *accord* Tr. 587-88.)  Risse further opined that,

> [t]aken as a whole, these results suggest mild difficult cerebral
> compromise, likely longstanding, associated with possibly
> more severe involvement of the temporal and mesial temporal
> lobes bilaterally of less certain etiology.   Although . . .
> [Plaintiff] performed within acceptable limits on a measure of
> symptom validity and effort, the possibility that her memory
> scores reflect in part reduced effort and/or emotional factors
> cannot be completely ruled out.

(Tr. 578; *accord* Tr. 588.)

      Risse concluded that Plaintiff's

> performance on testing and her responses to interview
> questions[] clearly reflect her sincere belief that she is
> significantly handicapped by these difficulties.  One factor that

> calls into question her absolute level of memory impairment is
> the fact that she remains oriented and functions independently
> in daily life[] while her test scores suggest that she is almost
> incapable of retaining any meaningful content over time.
> Nonetheless, the degree of atrophy noted on MRI is abnormal
> for her age, and warrants serial repeat studies to determine if
> she is experiencing progressive neurologic decline.

(Tr. 578; *accord* Tr. 588.)

**B. O'Regan**

Plaintiff had a consultative psychological examination with John O'Regan, Ph.D. (Tr. 591-97.)  Plaintiff "report[ed] that she is disabled because she has trouble with dizziness and knee pain." (Tr. 591.)  Plaintiff reported feeing "'overwhelmed' at work and as a result was 'out of it.'" (Tr. 591.)  Plaintiff "denie[d] being depressed." (Tr. 591.)  Plaintiff "kn[ew, however,] that she is more confused and th[at] her mind is 'not right.'" (Tr. 593.)  Plaintiff denied drinking other than having an occasional wine cooler. (Tr. 593.)

Plaintiff stated "that she may watch 2 hours of TV each day before she becomes 'woozy,'" and was able to "read for 30 minutes until her eyes hurt." (Tr. 592.)  Plaintiff might "walk half a block to the bus stop." (Tr. 592.)  Plaintiff reported that "it [wa]s hard for her to bend down because she becomes nauseous and dizzy; so therefore everything takes longer such as dressing and grooming herself." (Tr. 592.)  At the time, Plaintiff was living on her own, but O'Regan noted that Plaintiff "will be moving to her mother's shortly." (Tr. 593.)

Plaintiff's mother also attended the examination. (Tr. 591.)  Plaintiff's

> mother report[ed] that her daughter has trouble with thinking
> and memory since August 2015.  She states that her daughter
> is still confused.  She calls her family members at odd times

> during the night, occasionally crying, but usually her mother states that her daughter is irritable. Mother characterizes what happened to her daughter last year []as a "breakdown," stating that her daughter's self-care is not good, for example, she is not changing her clothes regularly.

(Tr. 593.) O'Regan noted that Plaintiff "may have to move to her mother's house[] because she no longer has income." (Tr. 593.)

O'Regan noted that Plaintiff was "appropriately dressed," "ma[de] good eye contact," "[wa]s talkative," and "laughed approximately once or twice during the interview." (Tr. 593.) Plaintiff's "thoughts [we]re clear, coherent, relevant, and goal directed." (Tr. 593.) Plaintiff's affect "[wa]s one of irritable depression." (Tr. 593.)

With respect to her attention span, Plaintiff could "recall[] six digits forwards and no digits correctly in reverse order. She was able to spell the word 'world' correctly both forwards as well as backwards. She did simple arithmetic such as 4 x 7 correctly." (Tr. 594.) As for her memory, Plaintiff "recalled three of three items immediately and one of three items after 5 minutes. After 20 minutes, she did not recall any of the items." (Tr. 594.) Plaintiff "knew the current president and two of his predecessors." (Tr. 594.) She was able to "abstractly interpret a simple proverb." (Tr. 594.) Plaintiff "showed poor judgment when she stated that she would go to the exit[] if she were the first person to see smoke and fire in a theatre." (Tr. 594.) Plaintiff's "insight into her illness [wa]s poor." (Tr. 594.)

O'Regan opined that Plaintiff was "borderline intellectually disabled" with moderate depression. (Tr. 595; *see* Tr. 594.) O'Regan additionally opined:

> Based on her current social and emotional functioning, she does not have the mental capacity to understand, remember and follow simple instructions. Her capacity to sustain attention and concentration is moderately impaired[] as a result of her current cognitive and emotional state. Thus, she would not be able to carry out work-like tasks with reasonable pace or persistence. She would also have difficulty responding appropriately to brief and superficial contacts with coworkers, supervisors, and the public.
>
> It is this examiner's opinion that she would not be able to tolerate the stress and pressures typically found in an entry-level work place [sic].

(Tr. 595.) O'Regan further opined that Plaintiff "d[id] not have the mental capacity to manage benefits on her own." (Tr. 595.)

### C. Simone

Simone submitted a statement in support of Plaintiff's applications, stating that she had been Plaintiff's primary care provider for the past three years. (Tr. 612.) Simone opined that Plaintiff "has an organic mental disorder to qualify under [listing] 12.02" as well as cerebral atrophy, which had been demonstrated through testing. (Tr. 612.) Simone further opined that Plaintiff "has a demonstrated loss of cognitive abilities with medically documented persistence of disorientation to time and place and extensive short-term memory impairment." (Tr. 612.) Additionally, Simone opined that Plaintiff's "activities of daily living are markedly restricted and she has marked difficulties in maintaining concentration." (Tr. 612.) Simone opined that Plaintiff's "mental disorder . . . impaired her ability to maintain employment." (Tr. 612.)

### D. State Agency Psychological Consultants

During the initial determination, the state agency psychological consultant opined that Plaintiff had an affective disorder, but it was non-severe. (Tr. 81, 90.) The state agency psychological consultant opined that Plaintiff had no limitation in her activities of daily living or in maintaining social functioning. (Tr. 81, 90.) The state agency psychological consultant opined that Plaintiff had mild limitation in maintaining concentration, persistence, or pace. (Tr. 81, 90.)

On reconsideration, a different state agency psychological consultant opined that Plaintiff had affective, anxiety, and somatoform disorders, and these mental impairments were severe. (Tr. 103-05, 121-23.) While this state agency psychological consultant agreed that Plaintiff had no limitation in her activities of daily living, the state agency psychological consultant opined Plaintiff had greater limitation in both social functioning and maintaining concentration, persistence, or pace. (Tr. 104, 122.) Plaintiff had mild limitation in social functioning and moderate limitation in maintaining concentration, persistence, or pace. (Tr. 104, 122.)

### V. HEARING TESTIMONY

At the hearing, Plaintiff testified that she last worked in July 2015, and was currently living at her mother and sister's homes. (Tr. 40, 43; *see* Tr. 50.) Plaintiff still experienced dizzy spells, particularly if she got up too fast or pushed herself too hard. (Tr. 56-57.) Plaintiff testified that she did not spend time with other family or friends on a regular basis. (Tr. 51.) Plaintiff testified that she needed to write things down in order to "get it right," and her ability to remember things depended on what she was doing. (Tr. 59.) Plaintiff

also testified that she did not have a problem with performing self-care, such as remembering to brush her teeth and bathe.  (Tr. 51.)  Plaintiff testified that she was able to count change.  (Tr. 52.)

Plaintiff testified that she no longer drives because her car broke down a few years ago.  (Tr. 41.)  Plaintiff used the bus after her car broke down, but most often got rides from her mother and sister.  (Tr. 41-42, 59, 64.)  When later asked whether she'd be able to take the bus from her mother's house to a local shopping area, Plaintiff was unsure and not able to answer the question, explaining: "It depends on where I be living at, or the distance probably, or because the buses, you know, some—where you live at, some buses don't run.  And they run at a certain time.  So it just depends.  I can't really answer that.  I don't know."  (Tr. 58.)

One of Plaintiff's sisters, P.S., also testified at the hearing.  (Tr. 60-68.)  P.S. testified that Plaintiff had been living with her for approximately two months and had lived with another sister for approximately one month before that.  (Tr. 61.)  When asked why Plaintiff was no longer living on her own, P.S. testified that it was a combination of an increase in rent and the episode of confusion in 2015.  (Tr. 61-62.)  P.S. testified that Plaintiff continues to have dizzy spells at least once a week.  (Tr. 63.)  P.S. testified that Plaintiff prepared simple foods, primarily using the microwave.  (Tr. 66-67.)  And while P.S. was not concerned about Plaintiff living on her own "physically," P.S. did have some concerns that Plaintiff might forget that she was cooking and leave the stove on.  (Tr. 67.)

P.S. testified that Plaintiff has good days and bad days with her memory.  (Tr. 60-61; *see* Tr. 65.)  As an example, P.S. testified that she can ask Plaintiff to do the dishes,

come back an hour later, and Plaintiff will not have done the dishes because she forgot. (Tr. 61.)  Plaintiff needed reminders to pay bills, for appointments, and for self-care.  (Tr. 65-67.)  P.S. reminded Plaintiff a couple of times per week about personal hygiene and changing her clothes.  (Tr. 67.)  As far as Plaintiff's ability to complete a task, P.S. testified that if it was written down, Plaintiff "may be able to get there," but otherwise would get off track.  (Tr. 68.)  P.S. did not think Plaintiff was able to take the bus on her own because she may not remember the correct stop, where she is going, or what she is doing.  (Tr. 67-68.)

P.S. testified that Plaintiff does not hang out with friends, but will talk with people on the phone.  (Tr. 63.)  When asked about how Plaintiff gets along with others, P.S. testified that Plaintiff gets along "fine" with other members of the family until "she thinks we're being bossy," and tended to avoid strangers.  (Tr. 64.)

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidence is not high."  *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Boettcher*, 652 F.3d at 863.  The ALJ's

decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff's assignments of error primarily concern steps three and four—whether her impairments met or equaled a listed impairment and the determination of her residual functional capacity.  *See, e.g.*, *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).  Because the Court recommends that this matter be remanded for reconsideration at step three, the Court declines to address Plaintiff's remaining arguments at step four and with respect to the Appeals Council.

The ALJ determined that Plaintiff had the severe impairments of mild atrophy of the brain and encephalopathy,[5] among others, and that these impairments when considered individually or in combination did not meet a listed impairment.  (Tr. 22-23.)  Plaintiff asserts that the ALJ erred in determining that her mental impairments did not meet or equal listing 12.02 for neurocognitive disorders.

---

[5]

> Encephalopathy is a term for any diffuse disease of the brain that alters brain function or structure. . . . The hallmark of encephalopathy is an altered mental state. Depending on the type and severity of encephalopathy, common neurological symptoms are progressive loss of memory and cognitive ability, subtle personality changes, inability to concentrate, lethargy, and progressive loss of consciousness.

*Encephalopathy Information Page*, Nat'l Inst. of Neurological Disorders & Stroke, https://www.ninds.nih.gov/disorders/all-disorders/encephalopathy-information-page (last accessed Jan. 23, 2020).

### A. Meets or Equals a Listed Impairment

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson*, 604 F.3d at 592 (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"An impairment meets a listing only if it 'meet[s] all of the specified medical criteria.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (alteration in original) (quoting *Sullivan*, 493 U.S. at 530). "An impairment is medically equivalent under the regulations if it is 'at least equal in severity and duration to the criteria of any listed impairment.'" *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)); *accord* 20 C.F.R. § 404.1526(a). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Carlson*, 604 F.3d at 594 (quoting *Sullivan*, 493 U.S. at 531). "The claimant has the burden of proving that h[er] impairment meets or equals a listing." *Id.* at 593.

**B. Listing 12.02**

Listing 12.02 addresses neurocognitive disorders, which

> are characterized by a clinically significant decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.B.1.a. Listing 12.02 is met or equaled when there is "[m]edical documentation of a significant cognitive decline from a prior level of functioning in *one* or more . . . cognitive areas" (the "A" criteria) accompanied by "[e]xtreme limitation of one, or marked limitation of two," area(s) of mental functioning (the "B" criteria). *Id.* § 12.02.A, .B. The parties focus only on the B criteria. *Cf. id.* § 12.02 (listing satisfied by A and B criteria or A and C criteria).

The B criteria "represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* § 12.00.A.2.b; *see id.* § 12.02.B; *see also* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The B criteria are evaluated on a five-point scale ranging from no limitation to extreme limitation. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2; *see* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). Moderate limitation means the claimant's ability to function in that area "independently, appropriately, effectively, and on a sustained basis is *fair*." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.c (emphasis added). The next point in increasing severity is "marked" limitation, meaning that functioning "is *seriously limited*." *Id.* § 12.00.F.2.d

(emphasis added).  The next and most severe point is "extreme" limitation, which occurs when a claimant is "*not able* to function in th[e] area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00.F.2.e (emphasis added).

When evaluating mental impairments, "all relevant medical evidence" is considered, including physicians and psychologists as well as other medical sources, such as "physician assistants." *Id.* § 12.00.C.2; *see id*. § 12.00.F.3.a.  Evidence from the claimant herself and individuals who know the claimant is also considered.[6]  *Id.* § 12.00.C.3;  *see id.* §§ 12.00.C.5.b, .F.3.a.  In rating the degree of limitation, the regulations recognize that "[t]he medical evidence may include descriptors regarding the diagnostic stage or level of . . . [a claimant's] disorder, such as 'mild' or 'moderate,'" and that "[c]linicians may use these terms to characterize . . . [a claimant's] medical condition." *Id.* § 12.00.F.3.a.  The regulations caution, however, that such terms will not always equate with the degree of limitation for purposes of the B criteria.  *Id.*  Further, the regulations provide that "no single piece of information (including test results) can establish the degree of limitation of an area of mental functioning."  *Id.* § 12.00.F.3.d.

### C. ALJ's Decision

The ALJ determined that Plaintiff's mild brain atrophy and encephalopathy caused moderate limitation in each of the B criteria.  (Tr. 22-23.)  Because Plaintiff's mental impairments did not result in at least two "marked" limitations or one "extreme" limitation,

---

[6] *See infra* n.11.

26

the ALJ concluded that the B criteria for listing 12.02 was not satisfied.  Plaintiff argues

that the opinions of O'Regan and Risse show a greater degree of limitation.

### D. Concentration, Persistence, or Pace

The Court focuses on the third criterion—maintaining concentration, persistence, or

pace—because it most clearly demonstrates the reason why remand is needed.[7]  *See* 20

C.F.R. pt. 404, subpt. P, app. 1, § 12.02.B.3.

> This area of mental functioning refers to the abilities to focus
> attention on work activities and stay on task at a sustained rate.
> Examples include: Initiating and performing a task that you
> understand and know how to do; working at an appropriate and
> consistent pace; completing tasks in a timely manner; ignoring
> or avoiding distractions while working; changing activities or
> work settings without being disruptive; working close to or
> with others without interrupting or distracting them; sustaining
> an ordinary routine and regular attendance at work; and
> working a full day without needing more than the allotted
> number or length of rest periods during the day.

*Id.* § 12.00.E.3.

O'Regan opined that Plaintiff's "capacity to sustain attention and concentration is

moderately impaired[] as a result of her current cognitive and emotional state.  Thus, she

would not be able to carry out work-like tasks with reasonable pace or persistence."  (Tr.

595.)  Assuming for sake of argument that O'Regan's use of "moderately" equates with

"moderate" limitation with respect to Plaintiff's ability to concentrate, *but see* 20 C.F.R.

pt. 404, subpt. P, app. 1, § 12.00.F.3.a, O'Regan additionally opined that Plaintiff could

not maintain persistence or pace—an extreme limitation because it is O'Regan's opinion

---

[7] *See infra* nn. 9, 10.

that Plaintiff is not able to function in these areas. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.e.

The regulations address situations like this in which there is a greater degree of limitation in one or more areas of mental functioning when compared to other areas in that criterion. *See id.* § 12.00.F.3.f. Under the regulations, "the *greatest degree* of limitation *of any part* of the area of mental functioning *directs* the rating of limitation of that *whole area* of mental functioning." *Id.* (emphasis added). "For example, . . . if you have marked limitation in maintaining pace, and mild or moderate limitations in concentrating and persisting, we will find that you have marked limitation in th[at] whole . . . area of mental functioning." *Id.* § 12.00.F.3.f(ii). Thus, because Plaintiff had greater limitation (extreme) in her abilities to maintain persistence or pace compared to the limitation (moderate) in her ability to maintain concentration, the regulations direct that Plaintiff has extreme limitation for this entire criterion. *See id.*

Plaintiff expressly relied on O'Regan's opinion when arguing to the ALJ that she met or equaled listing 12.02. (Tr. 22; *see* Tr. 310-12.) While acknowledging Plaintiff's argument and O'Regan's opinions, the ALJ determined: "With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation." (Tr. 23.) There is no discussion of O'Regan's opinions by the ALJ here or elsewhere in the decision.[8] Plaintiff need only show that she has extreme limitation in one of the B criteria in order for

---

[8] Unlike Risse and Simone, the ALJ did not address O'Regan's opinions in greater detail at step four when assessing Plaintiff's residual functional capacity either. (*See* Tr. 24-25.) And while the ALJ stated that "great weight" was given "to the State agency medical consultants," the ALJ did not include O'Regan among those consultants because, if the ALJ had, O'Regan's opinion would have dictated a finding of extreme limitation and thus disability at step three.

her mental impairments to meet or equal listing 12.02. O'Regan is a licensed psychologist, an acceptable medical source. 20 C.F.R. §§ 404.1502(a)(2)(i), 416.902(a)(2)(i). Thus, Plaintiff has presented medical evidence that she has extreme limitation in her ability to maintain concentration, persistence, or pace. *See* 20 C.F.R. §§ 404.1513(a)(2)(ii), .1527(a)(1), 416.913(a), .927(a)(1).

The regulations require "evaluat[ion of] every medical opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations further require, with respect to the evaluation of mental impairments, that the ALJ's "written decision . . . incorporate the pertinent findings and conclusions." 20 C.F.R. § 404.1520a(e)(4); *accord* 20 C.F.R. § 416.920a(e)(4).

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas . . . .

20 C.F.R. § 404.1520a(e)(4); *accord* 20 C.F.R. § 416.920a(e)(4). Here, it is unclear what the ALJ relied upon in concluding that Plaintiff had moderate limitation in her ability to maintain concentration, persistence, or pace. The Court is left with a single conclusory sentence for this criterion.

This is in contrast with the ALJ's discussion of the remaining B criteria, in which the ALJ provided some explanation as to what was considered in determining the degree of limitation. (*See* Tr. 22.) For example, in addressing Plaintiff's ability to understand, remember, or apply information, the ALJ noted that the record showed that Plaintiff "had

somewhat conflicting presentation with respect to her ability to understand, remember and

apply information." (Tr. 22.) The ALJ then discussed findings from Dr. Dahlquist and

Risse.[9]  (Tr. 22; *see* Tr. 614, 577, 587.)  Similarly, when addressing Plaintiff's ability to

interact with others, the ALJ discussed Plaintiff's "testi[mony] that she likes to socialize

with family, but does not have local friends," and Risse's observation that Plaintiff "is able

to establish a r[app]ort, maintain conversation and maintain eye contact."[10]  (Tr. 23; *see*

Tr. 577, 587.)  The decision contains no such discussion with respect to Plaintiff's ability

to maintain concentration, persistence, or pace.  This is more than an arguable deficiency

in opinion-writing.  *See Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) ("[A]n

---

[9] The absence of any discussion regarding O'Regan's opinion that Plaintiff "does not have the mental capacity to understand, remember and follow simple instructions" is also problematic here. (Tr. 595.)  The ability to understand, remember, or apply information

> refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.E.1.  O'Regan's opinion equates to an extreme limitation in this area of mental functioning as well.  *See id.* § 12.00.F.2.e.

The Court recognizes that an ALJ is "not required to provide an in-depth analysis on each piece of evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012).  And, it may be that the reasoning supplied by the ALJ applies with equal force to O'Regan's opinion.  Nevertheless, because (1) the ALJ was required to consider all medical opinions; (2) O'Regan opined Plaintiff had extreme limitation in this area of mental functioning; and (3) Plaintiff need only show that she has extreme limitation in one of the B criteria for her mental impairments to meet or equal listing 12.02, it should be apparent from the ALJ's discussion on remand that this piece of potentially dispositive evidence was considered.

[10] Unlike the first and third B criteria, O'Regan's opinion as to Plaintiff's ability to interact with others does not fall as neatly into the five-point scale.  O'Regan opined that Plaintiff "would . . . have difficulty responding appropriately to brief and superficial contacts with coworkers, supervisors, and the public." (Tr. 595.)  "Difficulty" suggests Plaintiff's degree of limitation is more than fair, i.e., moderate, but not non-existent, i.e., extreme.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.c, .e.

Assuming for purposes of these motions that O'Regan's opinion represents marked limitation in the ability to interact with others, a single marked limitation is not sufficient to meet or equal listing 12.02.  *Id.* § 12.02.B.  On remand, however, should the ALJ determine that Plaintiff has marked limitation in one or more areas of mental functioning, this piece of evidence is potentially dispositive, and thus it should be apparent from the ALJ's decision that this opinion was considered.  *See id.* § 12.00.C.2; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." (quotation omitted)). O'Regan's opinion directly bears on whether Plaintiff's mental impairments meet or equal listing 12.02.

The Commissioner contends that the ALJ was "entitled to consider . . . [O'Regan's] 'moderate' rating[] as some evidence" to support the determination. (Def.'s Mem. in Supp. at 7, ECF No. 17.) While that may be true, the § 12.00.F.3.f issue remains considering the greater degree of limitation in other areas of this criterion. The Commissioner further contends that O'Regan's opinion was not supported by his own findings and relied on Plaintiff's subjective complaints. Both of these are reasons an ALJ may place reduced weight on an opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); *see, e.g., Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016); *Garza v. Barnhart*, 397 F.3d 1087, 1088-89 (8th Cir. 2005). But, the Court cannot accept such *post hac* rationalizations. *See Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 n.7 (8th Cir. 1979) ("It is well established that an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of appellate counsel."). It is not the role of this Court to speculate on the reasons that might have supported the ALJ's decision or supply a reasoned basis for that decision that the ALJ never gave. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016); *accord Nebraska v. U.S. Envtl. Prot. Agency*, 812 F.3d 662, 666 (8th Cir. 2016); *see also Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992) ("We recognize

the well-established rule that an agency's action may not be upheld on grounds other than those relied on by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943))).

It may very well be, as the Commissioner notes, that O'Regan's opinion is inconsistent with his own findings or based on Plaintiff's subjective complaints. It may also be that O'Regan's opinion is inconsistent with other evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). But, the ALJ must explain how this opinion was treated in a manner that allows the Court to determine whether the ALJ's decision is supported by substantial evidence in the record as a whole.

Therefore, the Court recommends that the ALJ's findings with respect to steps four and five be vacated and this matter be remanded for reconsideration of whether Plaintiff's mild brain atrophy and encephalopathy meet or equal listing 12.02 at step three.[11]

[Continued on next page.]

---

[11] P.S.'s testimony touched on at least three if not all four of the B criteria. *See supra* Section V. Other than noting that P.S. "appeared and testified at the hearing" in the procedural history, the ALJ did not discuss her testimony. (Tr. 19.) Given that the Court recommends remand for reconsideration of whether Plaintiff's mental impairments meet or equal listing 12.02, the Court takes no position on whether P.S.'s lay testimony had any bearing on the outcome of this case. *Compare, e.g.*, *Nowling v. Colvin*, 813 F.3d 1110, 1121-22 (8th Cir. 2016) (failure to consider sister-in-law's testimony warranted remand), *with Buckner*, 646 F.3d at 559-60 (failure to consider girlfriend's statement had no bearing on outcome and remand not required).

## VII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons

stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 14) be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 16) be **DENIED**.

3. The Commissioner's decision be **VACATED** as to steps four and five.

4. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated: January __30__, 2020                          _____*s/ Tony N. Leung*_____
                                                      Tony N. Leung
                                                      United States Magistrate Judge
                                                      District of Minnesota


                                                      *Stacey S. v. Saul*
                                                      Case No. 18-cv-3358 (ADM/TNL)


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).